AO 106 (Rev. 7/87) Affidavit for Search Warrant

# United States District Court

### DISTRICT OF DELAWARE

In the Matter of the Search of
(Address or brief description of property or premises to be seized)

Wells Fargo Bank Account
Number ▇▇▇▇▇5693

APPLICATION AND AFFIDAVIT
FOR SEIZURE WARRANT

Case Number: 07- 81M

I, __Peter A. Gangel__, being duly sworn depose and say: I am a(n) __Special Agent, Federal Bureau of Investigation__, and have reason to believe that in the District of Utah there is now certain property which is subject to forfeiture to the United States, namely (describe the property to be seized)

the contents of Wells Fargo Bank account number ▇▇▇▇▇5693

**REDACTED**

which is (state one or more bases for seizure under the United States Code)

```
property involved in transactions in violation of 18 U.S.C. § 1960, or is traceable
to such property and as such is forfeit to the United States pursuant to 18 U.S.C.
§ 981(a)(1)(A)
```

The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:

SEE ATTACHED AFFIDAVIT.

Continued on the attached sheet and made a part hereof.    X  Yes    ___ No

_signature_
Signature of Affiant
Peter A. Gangel
Special Agent
Federal Bureau of Investigation

FILED
MAY 16 2007
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Sworn to before me, and subscribed in my presence

April __, 2007                    at    Wilmington, Delaware
Date                                       City and State

Honorable Mary Pat Thynge
United States Magistrate Judge
District of Delaware
Name and Title of Judicial Officer            Signature of Judicial Officer

## AFFIDAVIT OF SPECIAL AGENT PETER A. GANGEL

I, Peter A. Gangel, Special Agent, FBI, being duly sworn, state:

1. I am a Special Agent for the Federal Bureau of Investigation (FBI) currently assigned to the Wilmington, Delaware office. I have been employed as a Special Agent for more than twenty years, and my responsibilities include investigating financial crimes. I have conducted or assisted in conducting numerous investigations on many types of financial crimes including money laundering, bank fraud, wire fraud, and mail fraud. I have attended many training sessions and seminars regarding the investigation and seizure of evidence relating to the investigation of financial crimes.

2. This affidavit is submitted in support of the Application of the United States of America for a Seizure Warrant authorizing the seizure of all monies and funds contained in **Wells Fargo Bank account number▮▮▮▮5693** in the name of The Bullion Exchange Corporation, ▮▮▮▮▮▮▮▮▮▮▮ Salt Lake City, UT 84106 at the Wells Fargo Bank branch at 1▮▮▮▮▮▮▮ Road, Salt Lake City, Utah 84106.

3. This affidavit sets forth facts, and suggests reasonable inferences from those facts, that establish probable cause that The Bullion Exchange Corporation is operating in Delaware and elsewhere an illegal money transmitting business in violation of Title 18, United States Code, Section 1960 and Title 31, United States Code, Section 5330, and that the Wells Fargo Bank account contain funds which are subject to seizure and forfeiture to the United States pursuant to Title 18, United States Code, Sections 981 and 984, on the grounds they constitute property involved in violation of Title 18, United States Code, Section 1960, or property traceable to such property.

4. The statements contained in this affidavit are based upon my personal investigation, my review of information and records obtained during the course of the investigation, information provided to me by other FBI agents and law enforcement officers, communications with persons who have personal knowledge of the facts and circumstances described herein, as well as my training and experience. Because this affidavit is submitted for a limited purpose, it does not include each and every fact known to me concerning this investigation, and sets forth those facts believed necessary to establish probable cause that the Wells Fargo Bank account is involved in a violation of Title 18, United States Code (U.S.C.), Section 1960.

5. <u>Description of Bank Account to be Seized</u>: **Wells Fargo Bank account number▮▮▮▮5693** which was opened on October 19, 2004, in the name of The Bullion Exchange Corporation. Authorized signers on this account are Carol D. Neve and Don Neve. The account is held at the Wells Fargo Bank branch at 1▮▮▮▮▮▮▮ Road, Salt Lake City, UT 84106.

1

## Applicable Criminal Laws and Registration Requirements of Money Service Businesses

6. Title 18, U.S.C., Section 1960 prohibits unlicensed money transmitting businesses. "Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business" is in violation of Title 18, U.S.C., Section 1960(a).

7. Title 18, U.S.C., Section 1960(b)(1) describes an "unlicensed money transmitting business" as a "money transmitting business which affects interstate or foreign commerce in any manner" and (a) "is operated without an appropriate money transmitting license in the State where such unlicensed operation is punishable as a misdemeanor or felony under State law;" (b) "fails to comply with federal money transmitting business registration requirements under section 5330 of Title 31, United States Code;" or (c) "involves the transportation or transmission of funds known...to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity."

8. The term "money transmitting" is defined in Title 18, U.S.C., Section 1962 (b)(2) to include "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." Title 18, U.S.C., Section 1960(b)(2).

9. Under Delaware law, the failure of a money transmitting business to obtain a license is punishable as a misdemeanor. See 5 Del. Code 2317 and 5 Del. Code Section 2303 ("No person...shall engage in the business of selling checks, or issuing checks, or engage in the business of receiving money for transmission or transmitting the same without first having obtained a license hereunder.") Therefore, money transmitting businesses subject to Delaware law that operate without a valid license violate Title 18, U.S.C., Section 1960(a) and (b)(1)(A).

10. Under Title 31, U.S.C., Section 5330 and regulations promulgated there under, certain money services businesses (MSBs) are required to register with the Financial Crimes Enforcement Network (FINCEN) of the U.S. Department of Treasury. MSBs must register by completing form TD F 90-17.22.55, Registration of the Money Services Business. Registration is the responsibility of the owner or controlling person of the MSB. The owner or controlling person must sign and file the completed form with the IRS Detroit Computing Center, Money Services Business Registration.

11. Under Title 31, U.S.C., Section 5330(d)(1), and regulations promulgated there under, including 31 C.F.R. Sections 103.11 (uu) and 103.41, a business meets the definition of a MSB, and must register with FINCEN, if it provides one or more of the following products or services:
- Money transmission or remittance;
- Check cashing;
- Issuing or redeeming money orders, traveler's checks, stored value (debit) cards, or similar instruments;
- Currency dealing or exchange; or
- Informal money transfers.

Therefore, MSBs that operate without registering with FINCEN are in violation of Title 18, U.S.C., Section 1960(a) and (b)(1)(B).

### Background on Digital Currency Issuers and Exchangers

12. The term "digital currency" has been adopted by Internet-based "sellers" of gold, silver, platinum and other precious metals to describe the use of precious metals as a private currency for online payments. There are many types of digital currency issuers operating on the Internet. Some of the digital currency issuers which are currently operating include E-bullion, E-silver, Goldmoney, and Pecunix.

13. One of the most popular digital currency issuers is E-Gold Ltd., a Nevis corporation, which created e-gold, a private currency. E-gold is traded through the Internet and is accepted by a number of online merchants and vendors. According to the E-Gold Ltd.'s website (www.e-gold.com), e-gold is an electronic currency 100% backed at all times by gold bullion located in E-Gold Ltd. storage vaults. E-gold is integrated into an account based payment system that utilizes gold as money. Customers around the world may establish an e-gold account via the website. The e-gold account is denominated in gold weight, i.e., the amount of gold grams or ounces that the account holder owns. The e-gold payment system enables the e-gold account holder to transmit via the Internet specified weights of gold to other e-gold accounts. Thus, only the ownership of the gold changes, while the actual gold in the E-Gold Ltd. storage vaults is never transferred. This transfer of ownership of gold through the crediting and debiting of Internet-based accounts is how E-Gold Ltd. facilitates payments on behalf of their customers. Only a valid email address is required to open an e-gold account. As a result, e-gold accounts provide a certain level of anonymity to the users.

14. Once an e-gold account is opened, it must be funded. According to the E-Gold Ltd. website, there are two ways to fund an e-gold account: 1) receive payment in e-gold from another e-gold account holder; or 2) exchange your national currency, such as U.S. dollars, for e-gold using the services of an online digital exchanger. An online digital currency exchanger will take national currency from a customer and charge a fee to exchange the currency into e-gold for purposes of funding or increasing the value of an e-gold account. By the same token, an exchanger will also "exchange" the value in an e-gold account into a national currency. Exchange companies are typically the only method by which customers can obtain the value out of an e-gold account, short of taking possession of the gold itself.

15. Each exchange company offers different methods to exchange national currency for e-gold and other digital currencies. Some exchange companies accept cash and money orders, while others accept transfers from bank accounts or credit cards. Some exchange companies provide debit cards which can be funded with digital currency. The debit card can then be used to withdraw currency at ATMs up to the value of the digital currency on deposit with the exchanger. The exchanger generally operates independently from the digital currency issuer.

3

16. Online exchange companies do not verify the identities of their customers. Due to the high service fees charged by digital currency issuers and exchange companies, a digital currency account holder can expect to spend upwards of 10% to maintain and/or utilize digital currency to make online payments. Thus, there appears to be no economically sound reason for using digital currencies; however, with the anonymity the system affords, users can escape the scrutiny of financial institutions and/or law enforcement.

### State and Federal License /Registration Checks

17. According to records maintained by the State of Utah, Division of Corporations and Commercial Code, The Bullion Exchange Corporation was incorporated in Utah on September 24, 2004. Don and Carol D. Neve were identified as the Directors of The Bullion Exchange Corporation. Furthermore, Don Neve was designated as the President of The Bullion Exchange Corporation, while Carol D. Neve was identified as the Secretary/Treasurer.

18. The Office of the State Bank Commissioner for the State of Delaware is responsible for issuing licenses to business applicants seeking to operate as money transmitting businesses. On March 19, 2007, a representative of that office advised that The Bullion Exchange Corporation is not, and has never been registered as a MSB in the State of Delaware.

19. On March 19, 2007, your affiant was advised that The Bullion Exchange Corporation is not registered with FINCEN as a Money Service Business.

### The Investigation

Don Neve

20. In the summer of 2005 the FBI in New Haven, CT conducted an investigation regarding fraudulent and unauthorized wire transfers made from a victim's online brokerage account to The Bullion Exchange Corporation's account at Wells Fargo Bank (account number ████5693).

21. On September 13, 2005, Don Neve was interviewed by the FBI and identified himself as the owner of The Bullion Exchange Corporation which, he said, he primarily operated from his residence at ████████████, Salt Lake City, UT. Neve acknowledged that the Wells Fargo Bank account of The Bullion Exchange Corporation received the wire transfers from the victim's online brokerage account. The funds were subsequently utilized by The Bullion Exchange Corporation to fund an e-gold account that did not belong to the victim. However, Neve advised that he believed that the wire transfers to the account of The Bullion Exchange Corporation at Wells Fargo Bank had been authorized by the victim.

22. On December 29, 2006, Jean Miller, Investigative Manager, Bank of America, Las Vegas, NV advised that on August 12, 2005, Donald and Carol Neve, ████████████, Salt Lake City, UT opened a business checking account in the name of The Bullion Exchange Corporation at the Bank of America branch located at ████████████ Avenue, Las Vegas, NV. Miller

stated that numerous cash deposits were then made into this account at different Bank of America branches located throughout the United States. A significant amount of the deposits were then transferred out of the Bank of America account to the account maintained by The Bullion Exchange Corporation at Wells Fargo Bank (account number ▆▆▆▆5693). Miller said that there were also numerous checks being written on the account made payable to various individuals. Miller asked Don Neve about the activity in the Bank of America account. Neve advised Miller that he was a broker for e-gold and the cash deposits were from customers who wanted to invest in gold which was stored in warehouses located in Switzerland, Australia, and Los Angeles. Neve also told Miller that the "cents portion" of the cash deposits corresponded with the e-gold accounts of his customers.

23. Miller advised that Bank of America could not ascertain the identities of those individuals who were making the cash deposits into the account of The Bullion Exchange Corporation. Miller said that on January 6, 2006, Bank of America closed the account of The Bullion Exchange Corporation due to the unusual cash deposit activity and the nature of its business activities.

The Bullion Exchange's Website

24. The Bullion Exchange Corporation advertises on its website, www.thebullionexchange.com, that it is a "discount exchange provider of online digital money." The company states that it specializes in funding e-gold and e-bullion accounts. The website reflects that the company accepts money from the public through various remittance methods, including bank wires, direct cash deposits, money orders, and cashier's checks. The website specifies that cash deposits can be made at Wells Fargo Bank. Furthermore, the website says that all deposits are matched to the customer's order by the exact dollar and cents amount as specified by the company, as well as the location of the deposit. The Bullion Exchange Corporation also posts its fee schedule on the website. The company charges a customer between 2% to 3% to fund an e-gold account with U.S. currency.

Undercover Investigation

25.  On November 29, 2006, Special Agent Michael P. Brian, FBI, Baltimore Division, while acting in an undercover capacity, accessed the website of The Bullion Exchange Corporation in order to fund his undercover e-gold account (▆▆▆5809). SA Brian identified himself to the Bullion Exchange Corporation as Mister N. Anderson, ▆▆▆▆▆▆▆▆, Wilmington, DE 19850; telephone number: (302)▆▆▆▆▆; email: a▆▆▆▆▆▆▆▆@yahoo.com. SA Brian completed an online form and requested that his e-gold account (#▆▆5809) be funded with $123.00. SA Brian was informed via the website that the fee to exchange $123.00 for an equivalent amount of e-gold was $3.69. SA Brian was directed to mail a money order, in the amount of $126.69, to the following address: The Bullion Exchange, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, Salt Lake City, UT. He further was told that the money order must be in that precise amount -- $126.69 -- because that was how The Bullion Exchange would track his e-gold order. SA Brian also was instructed to print out an online confirmation order and mail it with his money order.

5

26. On December 1, 2006, your affiant purchased a postal money order with serial number ██████6234 in the amount of $126.69 and mailed the money order from Delaware to The Bullion Exchange, 2████████████, Salt Lake City, UT 84106. Investigation determined that this address is a UPS Store that provides mail box services. Your affiant enclosed in the envelope with the postal money order the confirmation order which The Bullion Exchange Corporation had directed SA Brian to enclose with the money order.

27. On December 6, 2006, The Bullion Exchange Corporation funded SA Brian's e-gold account (██5809) with $123.00.

28. On January 4, 2007, Postal Inspector Yvette Thomas, Wilmington, DE provided a photocopy of the negotiated postal money order with serial number ██████6234 that was mailed from Delaware to The Bullion Exchange Corporation. The back of the money order showed that, on December 14, 2006, the postal money order was deposited into the Wells Fargo Bank account of The Bullion Exchange Corporation (account number ██████5693).

### Review of Wells Fargo Bank Records

29. I have obtained and reviewed records from Wells Fargo Bank for account ██████5693 in the name of The Bullion Exchange Corporation, ████████████ Salt Lake City, UT 84106, for the period February 1, 2007, through February 28, 2007.

30. These records reflect that a large volume of deposits are being received into this account on a daily basis. The deposits for February 2007 totaled $2,216,542.13. The deposits are made in the form of either wire transfers or counter deposits. The wire transfers are received from a multitude of individuals who or companies that maintain accounts in United States or overseas banks. The counter deposits are being made into this account at various Wells Fargo Bank branches.

31. The records further indicate that once funds are deposited into this account, they are quickly transferred out of the account in the form of either checks or wire transfers to numerous businesses and individuals located in the United States or foreign countries. The records reflect that $2,184,149.83 was withdrawn from this account in February 2007.

32. Based upon my training and experience, the deposit/withdrawal activity in this account is indicative of someone operating a money transmitting business. It is apparent that the account is being used as a conduit to receive and transmit funds on behalf of the public.

### Analysis of Counter Deposit Activity and Wire Transfers

33. The counter deposits which were made into this account end in different cents amounts. For example, the records reflect that on February 5, 2007, the following counter deposits were made at Wells Fargo Bank branches and credited to this account:

6

Counter Deposit Amounts Posted to Account ▮▮▮▮5693 on February 5, 2007

| | | | | | | |
|---|---|---|---|---|---|---|
| $ 412.67 | $ 211.89 | $ 2997.21 | $ 515.32 | $ 155.65 | $102.27 | $ 62.21 |
| $ 72.71 | $ 124.22 | $ 2781.87 | $ 359.09 | $ 152.53 | $ 82.51 | $ 47.80 |
| $ 102.35 | $ 2060.08 | $ 1875.17 | $ 212.70 | $ 152.03 | $ 77.44 | $ 47.51 |
| $ 124.94 | $ 288.71 | $ 1030.40 | $ 206.42 | $ 149.36 | $ 77.15 | $ 47.34 |
| $ 278.03 | $ 52.98 | $ 515.97 | $ 200.53 | $ 116.54 | $ 63.00 | $ 47.22 |
| $ 9999.77 | $ 102.36 | $ 515.46 | $ 165.88 | $ 112.32 | $ 62.83 | $ 47.09 |
| | | | | | | $ 32.69 |

34. The amounts of the counter deposits are significant in that SA Michael Brian, while acting online in an undercover capacity, was directed by The Bullion Exchange Corporation to send a postal money order in the amount of $123.69 in order to fund his e-gold account in the amount of $120.00. SA Brian was instructed to send exactly $123.69 because some cents were added to his total amount in order that The Bullion Exchange Corporation could recognize his money order and process his request to fund his e-gold account as quickly as possible.

35. The counter deposit activity for this account indicates that The Bullion Exchange Corporation is receiving a large amount of money from numerous customers. Since, for the most part, each deposit for February 5, 2007, ends in a different cents amount, it is reasonable to assume that the deposits are being made by separate individual customers.

36. The records further reflect that in February 2007 The Bullion Exchange Corporation wired $118,000 to an account maintained by Gold and Silver Reserve at Seb Eesti Uhisbank (an Estonian Bank) and $39,000 to an account maintained by Goldfinger Coin and Bullion at the Bank of America. Gold and Silver Reserve has been identified as a Delaware corporation that operates the Internet e-gold payment system for E-Gold Ltd., while Goldfinger Coin and Bullion has been identified as an online digital currency exchanger that specializes in funding e-bullion accounts.

37. The records show that in February 2007, The Bullion Exchange Corporation wired $172,635 from its Wells Fargo account to an account maintained by Chronocash Corporation at Monterey County Bank. Chronocash Corporation has been identified as an online issuer of stored value cards. Chronocash advertises at its website, www.chronocash.com, that it accepts e-currencies for payment.

38. During this same time period, The Bullion Exchange Corporation wired $95,750 to an account maintained by Tesla Worldwide Services Ltd. at Standard Chartered Bank. Tesla Worldwide Services Ltd. has been identified as a company which operates online as an issuer of a stored value card, referred to as the "VirtuaCashCard." VirtuaCashCard advertises at its website, https://secure.virtuacashcard.com, that this stored value card can be loaded with funds via e-gold and these funds can be accessed through the card at ATMs around the world.

39. Accordingly, it is reasonable to believe that The Bullion Exchange is utilizing the Wells Fargo Bank account (▓▓▓▓5693) to transmit funds pursuant to the instructions of their customers to fund e-gold or e-bullion accounts or sell digital currency, as well as assist in the loading or issuance of stored value cards.

### E-Gold Ltd. Investigation

40. Records regarding e-gold account holders and account transactions were obtained from E-Gold Ltd. pursuant to a federal search warrant and grand jury subpoenas. These records reflect that The Bullion Exchange Corporation has three e-gold accounts which are used to operate its digital currency exchange business by holding the e-gold that it is selling to and buying from its customers.

41. An analysis of The Bullion Exchange Corporation's primary e-gold account, number ▓▓2900, reflected the following: The Bullion Exchange Corporation began operating the account on August 6, 2001. From August 2001 through October 2006 it conducted 69,821 e-gold transactions, with a total value of $178,867,744.10. This total was comprised of 26,278 deposits of funds into the account, with a total value of $88,323,607.08, and 43,093 transactions out of the account valued at $88,349,820.55. As of March 2007 approximately $138,737.52 remained in this e-gold account.

42. An analysis of the second e-gold account, number ▓▓5383, reflected the following: The account began operating in August 2005. From August 2005 through October 2006, The Bullion Exchange Corporation conducted 6509 transactions with a total value of $38,840,867, comprised of 388 transactions of funds into the account valued at $19,421,738, and 6121 transactions out of the account valued at $19,419,129. This account appears to serve as the e-gold account used by The Bullion Exchange Corporation to fund e-gold accounts for customers purchasing e-gold by bank wire or direct cash deposit, as opposed to other forms of payment. It appears that when additional e-gold is needed to fill the requests of customers, The Bullion Exchange Corporation transfers funds into this account from the above referenced primary account, number ▓▓2900. As of March 2007 the balance in this e-gold account was $0.

43. An analysis of the third e-gold account, number ▓▓9745, reflected the following: The account began operating in September 2005. From September 2005 through October 2006, The Bullion Exchange Corporation conducted 9853 transactions with a total value of $9,664,529. Of these transactions there were 273 transactions of funds received into the account valued at $4,832,454, and 9580 transactions of funds transferred out of the account valued at $4,832,075. This account appears to be used by The Bullion Exchange Corporation for customers funding their e-gold accounts through money orders and cashier's checks, as opposed to other forms of payment. It appears that when additional e-gold is needed to fill the requests of customers, The Bullion Exchange Corporation transfers funds into this account from the above referenced primary account, number ▓▓2900. As of March 2007 the balance in this e-gold account was $0.

### Conclusions

Based upon the investigation to date in this case, and on my training and experience in financial fraud investigations, it appears that The Bullion Exchange Corporation in the District of Delaware and elsewhere, is utilizing account number ▮▮▮▮5693 at Wells Fargo Bank, ▮▮▮▮ Road, Salt Lake City, UT 84106 to control, manage, and operate an illegal, i.e. unlicensed, money transmitting business in violation of Title 18, U.S.C., Section 1960. Therefore, this account is subject to forfeiture pursuant to Title 18, U.S.C., Sections 981(a)(1)(A) and 984.

*Peter A. Gangel*
Peter A. Gangel, Special Agent
Federal Bureau of Investigation

SWORN AND SUBSCRIBED TO THIS
25 day of April, 2007.

_____
Honorable Mary Pat Thynge
United States Magistrate Judge

9